IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| AUSTIN MICHAEL BEBER, | **8:23CV323** |
| Plaintiff, | **8:23CV325** |
| vs. | |
| NAVSAV HOLDINGS, LLC, | **MEMORANDUM AND ORDER ON** |
| Defendant. | **MOTIONS FOR PRELIMINARY** |
| | **INJUNCTIONS** |
| CODY ROACH, | |
| Plaintiff, | |
| vs. | |
| NAVSAV HOLDINGS, LLC, | |
| Defendant. | |

In these separate actions originating in state court, former insurance account representatives sue their former employer to bar enforcement of restrictive covenants in their employment contracts after they started working for another insurance company. Each plaintiff obtained an *ex parte* temporary restraining order from the state court, which was then extended by this Court after removal of their cases. The temporary restraining orders enjoined the former employer from making any further submissions, filings, or appearances in the former employer's action against the former employees in Texas state court and from taking any action to enforce the noncompetition and non-solicitation covenants in their employment contracts. This matter is before the Court after a joint hearing on the plaintiffs' Motions for Preliminary Injunctions. For the reasons stated below, the Motions for Preliminary Injunctions are granted.

1

# I.  INTRODUCTION

These separate actions by plaintiffs Austin Michael Beber and Cody Roach against defendant NavSav Holdings, LLC, their former employer, have not been formally consolidated. However, the Court held a joint hearing on Plaintiffs' Motions for Preliminary Injunctions. Furthermore, because the pleadings and filings are nearly identical, all references in this ruling are to Beber's case except when expressly indicated otherwise. Citations to the record in Roach's case are not provided for similar facts because the Court's statement of facts pertaining to Roach will indicate any differences from facts pertaining to Beber.

## A.  Factual Background

This statement of the factual background is drawn from the Complaint in the first-filed case, *Beber v. NavSav Holdings, LLC*, Case No. 8:23cv323, with occasional additions from the Complaint in the second case, *Roach v. NavSav Holdings, LLC*, Case No. 8:23cv325. The factual background is also drawn from the evidence submitted at the preliminary injunction hearing. Overlapping and/or identical exhibits were offered in each case. To avoid confusion, all citations to the record in this decision are to the docket numbers and docket page numbers of documents in Beber's case. References to comparable documents in Roach's case appear without docket citations. Unless otherwise indicated, these factual statements appear to be undisputed. The Court's factual findings in this decision are provisional and not binding in future proceedings. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("[F]indings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits[.]") (citations omitted); *SEC v. Zahareas*, 272 F.3d 1102, 1105 (8th Cir. 2001) (same).

### 1.   *The Parties and Their Contracts*

Prior to April 12, 2022, Beber and Roach were at-will employees of Universal Group, Ltd., a corporation licensed to sell insurance in Nebraska. Filing 1-1 at 64–65 (¶¶ 5–14). On or

about April 12, 2022, Universal was acquired by defendant NavSav Holdings, LLC. Filing 1-1 at 65 (¶ 14); Filing 8-1 at 1 (¶ 5) (stating that NavSav's purchase of Universal occurred on April 14, 2022). NavSav is a Texas company with its principal place of business in Beaumont, Texas. Filing 1-1 at 176 (¶ 2). NavSav is an insurance agency conglomerate with sixty to seventy individual agencies, a ten-person executive management team, operations in at least seventeen states, and access to more than one-hundred-fifty carriers. Filing 1-1 at 65 (¶ 15).

Beber and Roach allege that their at-will employment with NavSav began on the date NavSav purchased Universal and that NavSav presented them with form employment applications only after the acquisition of Universal and after their employment with NavSav began. Filing 1-1 at 65–66 (¶¶ 16–17). Beber and Roach also claim that on April 20, 2022, after NavSav's acquisition of Universal, NavSav presented each of them with a NavSav form Non-Competition, Non-Solicitation, Confidential and Non-Disclosure Agreement (the April Agreement), which each signed a few days later. Filing 1-1 at 66 (¶¶ 19–20). The April Agreement for Beber states that it was "entered into" on April 14, 2022. Filing 1-1 at 77. The electronic record of the document execution indicates that the Agreement was provided to Beber on April 20, 2022, and that he signed it on April 25, 2022. Filing 1-1 at 85; *see also* Filing 1-1 at 66 (¶¶ 19–20) (Beber Aff.) (confirming receipt and signature dates). The comparable April Agreement for Roach also states that it was "entered into" on April 14, 2022. T he electronic record of the document execution indicates that the Agreement was provided to Roach on April 20, 2022, and that Roach signed it on April 26, 2022. Beber avers that he did not participate in the drafting of the April Agreement. Filing 1-1 at 66 (¶ 21). He also avers that he did not engage in any negotiations regarding the April Agreement and that he was not represented by counsel before or at the time he signed the April Agreement. Filing 1-1 at 66 (¶ 22). Roach avers that he

did not participate in drafting the April Agreement and was not represented by counsel before or at the time he signed the April Agreement.

In contrast, Daniel Headlee, NavSav's Vice President of Commercial Sales, avers that Roach and Beber negotiated the terms of their employment with NavSav after NavSav purchased Universal, that each negotiated for a higher commission structure, and that each also signed various employment-related documents for NavSav as part of the terms of their NavSav employment. Filing 8-1 at 3 (¶ 12). Ragen Murray, NavSav's Vice President of Talent and Human Resources, avers that she attended a meeting with Beber and Gary Sanders, another NavSav employee, during which Beber and Sanders negotiated certain terms of Beber's employment with NavSav, including his commission rates. Filing 8-2 at 3 (¶ 11). Murray makes an identical averment about a meeting with Roach and Sanders during which Roach and Sanders negotiated certain terms of Roach's employment with NavSav, including his commission rate. Filing 8-2 at 2 (¶ 8). Murray avers that the documents received, completed, and signed by Beber and Roach include in addition to the April Agreement a "Pay Details Form" sent to and signed by Roach on April 21, 2022, Filing 8-2 at 2 (¶ 10), and sent to Beber on April 18, 2022, and signed by him on April 21, 2022, Filing 8-2 at 3 (¶ 13). Headlee also avers that NavSav would not have retained Roach and Beber without execution of the April Agreement, nor would NavSav have agreed to and paid their higher commission structure or given them access to NavSav confidential information including pricing, contract terms, and other information that is only available to NavSav employees. Filing 8-1 at 4 (¶ 15).

### 2. *Pertinent Contract Provisions*

#### a. The NavSav April Agreements

The restrictive covenants in the April Agreement for each Plaintiff include the following non-competition provision:

**4.(a).** **Covenant Not to Compete; Area Restriction.** Employee agrees that he/she will not, without prior written consent of Employer, directly or indirectly on his/her own account, or in any individual or representative capacity, or on behalf of or in conjunction with any person, partnership, agency, or corporation, engage, participate, be employed by, be an agent of or manager for, be a producer for, or own an interest in any business in competition with the business of Employer for a period of one (1) year from the date of Employee's last date of employment with NavSav, and within a five (5) mile radius of Employee's primary office location during Employee's employment. For purposes of clarity, the one (1) year and five (5) mile restrictions are combined and read together as one (1) restriction, i.e. Employee cannot open or work for an insurance agency that is both within the five (5) mile radius and within one (1) year of employment. "Business of the Company" shall include, but not be limited to, an insurance agency or other similar business engaged in the sale and service of insurance and insurance related products, services, and policies.

Employee understands the nature and extent of selling insurance products and insurance services out of a certain geographical location. Employee agrees that the covenant not to compete that limits employment for one (1) year within five (5) miles of Employee's last location is not an industry wide exclusion because: (1) Employee recognizes and understands he/she can work outside the five (5) mile radius; and (2) due to the nature of selling insurance, the limitation is necessary to protect the legitimate business interest of Employer to keep Employee from selling to the same territory of customers as Employee did prior to termination.

Filing 1-1 at 77–78 (bold and underlining in the original).

The April Agreements also include the following non-solicitation provisions:

**4.(b).** **Covenant Not to Solicit; Customers.** Employee agrees that he/she will not, without prior written consent of Employer, directly or indirectly on his/her own account, or in any individual or representative capacity, or on behalf of or in conjunction with any person, partnership, agency, or corporation, solicit or attempt to solicit, the transfer of any customers or policies, cancellation of customers or policies or writing of new insurance policies for any customer that is a part of any book of business owned by NavSav or a NavSav related or affiliated entity, or divert (or attempt to divert) any customer that is a part of any book or business owned by NavSav or a NavSav related or affiliated entity from continuing to do business with Employer for a period of three (3) years from Employee's last date of employment with Employer. Employee specifically agrees that because of the nature of NavSav and the agency Employee is working for, Employee will have access to all customers of NavSav, not just specific customers that Employee has had contact with. If this provisions is required to be reformed, to reflect that it applies to customers that the Employee had contact with or dealt with, Employee agrees and acknowledges that Employee will have contact with all customers at any agency or location when Employee is employed.

5

Employee agrees that "customers Employee had contact with" is every customer in every location where Employee has or will work.

Additionally, Employee agrees that due to the nature of Employer's business it is not possible to limit any of the non-compete or non-solicitation provisions in this Agreement to just customers with whom Employee had dealings because Employee will most likely have dealings, contacts and access to all customers of Employer.

Employee specifically agrees and acknowledges that protecting against the solicitation of all Employer's customers is a legitimate business interest worthy of a covenant not to compete.

**4.(c). <u>Covenant Not to Solicit; Employees.</u>** Employee agrees that he/she will not, without prior written consent of Employer, directly or indirectly on his/her own account, or in any individual or representative capacity, or on behalf of or in conjunction with any person, partnership, agency, or corporation solicit or attempt to solicit, hire, or attempt to hire, any agency producers, agents, employees, or staff members of NavSav or any NavSav related entity for a period of five (5) years from Employee's last date of employment with Employer.

Filing 1-1 at 78 (bold and underlining in the original).

Other provisions pertinent here are the following choice-of-law and forum-selection

provisions:

**17. <u>Choice of Law.</u>** The legality of this Agreement and of any other terms or provisions, as well as the rights and duties of the parties hereunder, shall be governed by the laws of the State of Texas.

**18. <u>Jurisdiction</u>.** The parties consent to the exclusive jurisdiction and venue of District State Court located in Jefferson County, Texas in any action arising out of or relating to this Agreement. The parties waive any other venue to which either party might be entitled by domicile or otherwise and the parties agree that venue for any dispute related to this Agreement is <u>mandatory</u> in a District Court located in Jefferson County, Texas.

Filing 1-1 at 83–84 (bold and underlining in the original). The last provision of the April

Agreement of interest here is the following definition of "affiliates" of NavSav:

21. <u>Employer Affiliates</u>. In this Agreement, no matter what entity is listed as Employer, "Employer" means NavSav Holdings, LLC, NavSav Holdings II, LLC, NavSav Holdings, III, LLC, NavSav, LLC or any NavSav related or affiliated entity.

6

Filing 1-1 at 84 (¶ 21) (underlining in the original).

    **b.** The Universal Agreements

NavSav alleges that as part of the purchase of Universal, Universal assigned to NavSav all right, title, and interest to non-competition, confidentiality, non-disclosure, and other restrictive covenants with Universal's employees (the Universal Agreements). Filing 8-1 at 2 (¶ 8). NavSav offered the Universal Agreements into evidence at the preliminary injunction hearing. *See* Filing 8-4; Filing 8-5; Filing 8-6. NavSav argues that the Universal Agreements are relevant to Beber's and Roach's likelihood of success on the merits of their claims. Filing 7 at 25. Beber and Roach argue that NavSav cannot benefit from the assigned restrictive covenants for various reasons. *See* Filing 16 at 12–16. The Court will address the parties' arguments concerning the Universal Agreements to the extent necessary in the legal analysis below. For now, the Court will set out provisions of the Universal Agreements that NavSav appears to assert are relevant in this case.

Beber and Universal entered into an agreement dated October 31, 2016, containing the following provision that NavSav identifies as a "nonsolicitation agreement":

> 6. <u>Noncompetition for Certain Loring & Company Customers</u>. Upon termination of employment hereunder, either voluntary or involuntarily, and for whatever reason, Employee agrees that for a period of two (2) years following such termination, he will not, without the written consent of Loring & Company, directly or indirectly, solicit or accept any business as described in paragraph 3. hereof, or perform any of the services so described for any Loring & Company Customers with whom he has had business or personal relations during the term of this Agreement.

Filing 8-6 at 2 (¶ 6) (underlining in the original). Paragraph 3 cross-referenced in this provision states the following definition:

> 3. <u>Universal Group Business</u>. All business, fees, and premiums, including insurance, bond, risk management, self insurance, consulting, brokerage and all other services (collectively the "Universal Group Business"), produced, transacted

7

or received through the efforts of Employee, shall be the sole property of
Universal Group.

Filing 8-6 at 1 (¶ 3) (underlining in the original). Dan Headlee, who was the owner of Universal Group, Ltd., and Loring & Company, and is now the Vice President for Commercial Sales for NavSav, avers that he purchased Loring & Company in 2013, then changed the name to Universal Group, Ltd., although Loring & Company remains a trade name for Universal Group, Ltd. Filing 8-1 at 1 (¶¶ 3–4).

Roach and Universal entered into an agreement in March 2022[1] containing the following provision that NavSav identifies as a "nonsolicitation agreement" much like ¶ 6 of Beber's agreement with Universal:

6. Noncompetition for Certain Universal Group Customers. Upon termination of employment hereunder, either voluntary or involuntary, and for whatever reason, Employee agrees that for a period of one (1) year following such termination, he will not, without the written consent of Universal Group, directly or indirectly. solicit or accept any business as described in paragraph 3. hereof, or perform any of the services so described for any Universal Group Customers with whom he has had business or personal relations during the term of this Agreement.

Filing 8-5 at 2 (¶ 6) (underlining in the original). Paragraph 3 of Roach's agreement is identical to paragraph 3 of Beber's agreement. Filing 8-5 at 1 (¶ 3).

On March 18, 2022, Roach and Universal entered into another agreement entitled "Proprietary Information Agreement." Filing 8-4 at 1–2. It appears that the portions of this agreement that NavSav contends are relevant include the following promise in the third subparagraph of ¶ 2 entitled "Confidential Information":

Employee agrees that he/she will not without the written consent of Universal Group, disclose or make any use of any such Confidential Information except as may be required in the course of her employment hereunder.

---

[1] The specific day in March 2022 is illegible in the copy in the record but may be March 18, 2022.

8

Filing 8-1 at 1 (¶ 2, third unnumbered subparagraph). Another portion of this agreement that NavSav appears to argue is relevant is the following:

> 4. Conditions. As a condition of my continued employment, I agree:
>
> a) all information disclosed to me, or to which I obtain access, whether originated by me or by others, during the period of my employement [sic], which I have reasonable basis to believe is proprietary information, or which is treated by Universal Group as proprietary information, shall be presumed to be proprietary information;
>
> b) except as required in the discharge of my duties to Universal Group, I will never, either during my employment by Universal Group or thereafter, use or disclose any proprietary information;
>
> c) should my employment with Universal Group ever terminate, I will immediately turn over all records and any other items which disclose or embody proprietary information, including all copies in my possession; and
>
> d) I will inform any new employer, prior to accepting employment, of the existence of this Agreement and provide such employer with a copy of same.

Filing 8-4 at 1–2 (¶ 4) (underlining in the original).

> 3.     *Plaintiffs' Employment with and Resignation from NavSav*

Beber and Roach aver that during their employment with NavSav, they worked primarily at NavSav's office in Omaha, Douglas County, Nebraska, and at no point did they work from any location in Texas. Filing 1-1 at 68 (¶ 27). Both also aver that they sold NavSav insurance policies and advised NavSav clients on policy coverage, loss mitigation, and other things. Filing 1-1 at 68 (¶ 26). They aver that, throughout their employment with NavSav, they were never assigned to solicit customers located in Texas, never solicited or procured customers in Texas, and instead solicited or procured the vast majority of the policies for NavSav for policyholders located in Nebraska and Iowa. Filing 1-1 at 69 (¶ 28). They aver that the paychecks they received for their employment with NavSav deducted withholding for Nebraska state income tax. Filing 1-1 at 69 (¶ 29). On behalf of NavSav, Headlee avers that from April 2022 until Beber's

9

resignation, NavSav paid Beber $439,059.88 in wages, including commissions. Filing 8-1 at 7
(¶ 39). Headlee avers that from April 2022 through Roach's resignation, NavSav paid Roach
$175,271.14 in wages, including commissions. Filing 81-1 at 7 (¶ 40).

On June 1, 2023, Beber provided NavSav's Executive Leadership Team with a written
notice of his intent to resign his employment with NavSav and any of its affiliates effective June
16, 2023. Filing 1-1 at 86. Beber avers that following NavSav's receipt of his resignation letter,
Brent Walters, NavSav's CEO, traveled to Omaha on June 5, 2023, to meet with Beber at
NavSav's Omaha office "to urge me to stay employed with NavSav," which Beber declined to
do. Filing 1-1 at 69 at (¶ 33). Beber avers further than Walters told him that "he did not mind if I
competed with NavSav after my employment ended as I have to earn a living, but that NavSav
will protect its customers and that if I solicit any NavSav customer, NavSav will sue me in Texas
to enforce the restrictive covenants contained in the [April] Agreement." Filing 1-1 at 69 (¶ 33).
Beber avers that, in reliance on Walters's statements that he could compete with NavSav and in
reliance on Nebraska law and public policy, he made a final decision to accept and start
employment with UNICO Group for the purpose of soliciting business and earning commissions.
Filing 1-1 at 69 (¶ 35).

On behalf of NavSav, Headlee avers that after Beber resigned but before his last day,
Beber hired legal counsel to attempt to negotiate a "buyout" of Beber's book of business and to
cancel the post-employment restrictive covenants not just of Beber, but also of Roach and
another NavSav employee, Jacqueline Damon. Filing 8-1 at 4 (¶ 18).[2] Headlee avers that during

---

[2] Damon also brought suit against NavSav in Nebraska state court, and that action was also removed to this
Court as *Damon v. NavSav Holdings, LLC*, Case No. 8:23cv351. Because Damon's request for a temporary
restraining order and a preliminary injunction involve somewhat different circumstances and issues, it was
considered in a separate hearing after the hearing on Beber's and Roach's Motions for Preliminary Injunctions and
her motions will be resolved in a separate ruling.

the attempted negotiations, Beber—through his counsel—asserted that the covenant not to solicit customers was unenforceable. Filing 8-1 at 4 (¶ 18). Headlee avers that Beber asserted that "NavSav will be unable to keep the commercial lines customers after they learn that Cody Roach, Jackie Damon, and Austin Beber have resigned from NavSav. So, NavSav's additional ROI will quickly go to zero." Filing 8-1 at 4 (¶ 18). Headlee avers further that Beber wanted to be free of a covenant not to solicit business and asserted that NavSav's April Agreement is unenforceable, but Beber nevertheless wanted NavSav to agree not to solicit the same customers if Beber was able to negotiate a buyout. Filing 8-1 at 5 (¶ 18). Headlee avers that Roach and Beber announced their new employment with UNICO Group on social media, stating that Roach and Beber will be concentrating on "building tailored insurance solutions within the auto dealing, towing and auto, and auto aftermarket industry across Nebraska." Filing 8-1 at 5 (¶ 18). Headlee avers that these are the NavSav customers with whom Beber and Roach had personal contacts and dealings while employed with NavSav. Filing 8-1 at 5 (¶ 18).

Beber avers that he started his employment with UNICO, an insurance and financial provider, on June 19, 2023. Filing 1-1 at 70 (¶ 39). He avers that the UNICO office where he now works is more than five miles away from the NavSav Office where he primarily worked during his employment with NavSav. Filing 1-1 at 70 (¶ 40). Finally, for present purposes, Beber avers that he believes that the restrictive covenants (and other provisions) contained in the April Agreement are invalid and unenforceable, and that he is free to compete against NavSav and to solicit customers of NavSav to transition their insurance business to UNICO. Filing 1-1 at 70 (¶ 41).

On June 1, 2023, Roach—like Beber—provided Brent Walters and Dan Headlee with his written notice of resignation from NavSav, also effective June 16, 2023. Roach avers that on

June 2, 2023, during a telephone call with Walters, Walters told him that NavSav "would come after [him]" if he went to work for a competitor or if he contacted any of NavSav's customers. Like Beber, Roach avers that he started his employment with UNICO on June 19, 2023. He avers that the UNICO office where he now works is more than five miles away from the NavSav Office where he primarily worked during his employment with NavSav. Finally, for present purposes, Roach avers that he believes that the restrictive covenants (and other provisions) contained in the April Agreement are invalid and unenforceable, and that he is free to compete against NavSav and to solicit customers of NavSav to transition their insurance business to UNICO.

4.      *The Aftermath*

Headlee avers that since their resignations, Beber and Roach have been soliciting NavSav's customers in Iowa and Nebraska that they serviced while working for NavSav. Filing 8-1 at 5 (¶ 20). Headlee avers that as of July 31, 2023, the total amount of premiums for NavSav customers that Beber has transferred to UNICO exceeds $395,000. Filing 8-1 at 6 (¶ 31). Similarly, Headlee avers that as of July 31, 2023, the total amount of premiums for NavSav customers that Roach has transferred to UNICO exceed $117,000. Filing 8-1 at 6 (¶ 37).

**B. Procedural Background**

Beber filed his Complaint against NavSav in the District Court for Douglas County, Nebraska, on June 23, 2023. Filing 1-1 at 176. In his Complaint, Beber's first claim for relief is for declaratory judgment that parts of the NavSav April Agreement, including without limitation the restrictive covenants, are invalid and unenforceable under Nebraska law, which Beber asserts applies. Filing 1-1 at 184. Beber's second claim for relief seeks temporary and permanent injunctions "restraining NavSav from (i) enforcing or threatening to enforce the restrictive covenants contained in the NavSav and Universal Agreements and (ii) bringing suit against

12

Beber in Texas and applying Texas law to enforce the restrictive covenants contained in the NavSav and Universal Agreements." Filing 1-1 at 198. Beber's third claim for relief is for tortious interference with business relationships or expectancies of his employment with UNICO. Filing 1-1 at 199. Beber's fourth claim for relief is for violations of the Nebraska Wage Payment and Collection Act for accrued but unpaid paid time off. Filing 1-1 at 201. Summons was issued on June 26, 2023, Filing 1-01 at 171, and that summons was served on NavSav on June 28, 2023. Filing 16 at 4. Roach filed his Complaint on June 30, 2023, and an Amended Complaint on July 5, 2023. Roach's claims are essentially identical to Beber's, although Roach's Amended Complaint includes a fifth claim for relief for violation of the Nebraska Wage Payment and Collection Act for earned but unpaid commissions.

Beber's counsel avers—and NavSav does not dispute—that NavSav filed a Petition against Beber, Roach, and another former employee, Jacqueline Damon, on June 26, 2023, in the District Court of Jefferson County, Texas, 58th Judicial District Court; a First Amended Petition on July 5, 2023; a Second Amended Petition on July 6, 2023; and a Third Amended Petition on July 17, 2023. Filing 1-1 at 88–89 (¶¶ 4–5). A copy of NavSav's Third Amended Complaint is found at Filing 1-1 at 91–106. In the Third Amended Complaint, NavSav asserts causes of action for breach of contract, Filing 1-1 at 100; tortious interference with contract, Filing 1-1 at 101; tortious interference with prospective business relations, Filing 1-1 at 101; and statutory trade secret misappropriation pursuant to the Texas Uniform Trade Secrets Act. Filing 1-1 at 102. Beber asserts, and NavSav does not dispute, that as of July 21, 2023, Beber had not been served with any version of NavSav's Petition. Filing 1-1 at 71 (¶ 48).

On July 6, 2023, the Texas state court issued an Ex Parte Temporary Restraining Order against Beber, Roach, and Damon, even though Beber had not been served. Filing 1-1 at 142.

13

The Texas state court extended that Ex Parte Temporary Restraining Order on July 17, 2023, until August 1, 2023, even though Beber still had not been served. Filing 1-1 at 147. The Texas state court's temporary restraining order required Beber, Roach, Damon, and UNICO to desist and refrain from "[c]ontacting, soliciting, attempting to divert business to themselves and providing any insurance services including writing or binding policies for any of the clients/customers that Defendants Austin Beber, Cody Roach, [and/or] Jacqueline Damon had contact with while they worked for [NavSav]." Filing 1-1 at 143. It also required them to desist and refrain from "[u]sing in any manner or disclosing any confidential information belonging to [NavSav] including customer names, customer contacts, and customer information including the use of customer information [to] Unico Group, Inc." Filing 1-1 at 143. It also required them to desist and refrain from "[m]aking any attempts to divert any customer from continuing to do business with [NavSav]," Filing 1-1 at 143.[3] By its terms, the Texas temporary restraining order has expired after the extension ordered by the Texas state court.

On July 21, 2023, fifteen days after NavSav obtained its Ex Parte Temporary Restraining Order but prior to service on Beber, the Nebraska state court issued an Ex Parte Temporary Restraining Order against NavSav in Beber's case. Filing 1-1 at 20. That Ex Parte Temporary Restraining Order restrained NavSav "[f]rom making any further submissions, filings or appearances in" the Texas case brought by NavSav, and "[f]rom taking any action to enforce the noncompetition and non-solicitation covenants in the NavSav Agreement between NavSav and Plaintiff until July 31, 2023 at 5:00 p.m. CDT." Filing 1-1 at 28. The Nebraska state court also set a hearing on Beber's Motion for Temporary Injunction (the state counterpart of a federal preliminary injunction) for July 31, 2023, at 1:00 p.m., in Omaha "or as soon thereafter as

---

[3] These are the most pertinent terms of the Texas state court's temporary restraining order; this is not a complete statement of the terms of that temporary restraining order.

counsel may be heard." Filing 1-1 at 29. NavSav was served with the Ex Parte Temporary Restraining Order in Beber's case on July 21, 2023. Filing 1-1 at 4. The Nebraska state court issued an Ex Parte Temporary Restraining Order in Roach's case on July 24, 2023, on essentially identical terms as in Beber's case, including the expiration date and hearing date.

The record reflects that NavSav removed Beber's Complaint to this Court on July 27, 2023, before the hearing on Beber's and Roach's Ex Parte Temporary Restraining Orders could be held in state court on July 31, 2023. Filing 1. NavSav removed Roach's Complaint the next day. NavSav asserts that Beber removed NavSav's Texas state court case to Texas federal court on July 30, 2023, just before the preliminary injunction hearing in Texas state court scheduled for August 1, 2023. Filing 7 at 8. Beber asserts, and the record reflects, that UNICO removed the Texas state court case to Texas federal court. Filing 15-1 at 1.

On July 31, 2023, this Court entered an Order Extending Temporary Restraining Order; Setting Hearing on Preliminary Injunction; and Setting Requirements for Submissions Regarding Motion for Preliminary Injunction in both Beber's case and Roach's case. Filing 5. The Order extended the Ex Parte Temporary Restraining Order filed in state court until 5:00 p.m. CDT on August 14, 2023, and set a hearing on the Motions for Preliminary Injunction for August 7, 2023. Filing 5 at 5. At the unopposed request of NavSav, the Court extended the Ex Parte Temporary Restraining Order to the earlier of 7 days after the preliminary injunction hearing or the issue is otherwise decided by the Court and reset the joint hearing on the Motions for Preliminary Injunction for August 18, 2023. Filing 19 at 2.

The parties made their pre-hearing submissions, and the Court held the Preliminary Injunction Hearing as scheduled on August 18, 2023. The Court now provides its written disposition of the Plaintiffs' Motions for Preliminary Injunctions.

## II.  LEGAL ANALYSIS

### A.  Preliminary Injunction Standards

Federal Rule of Civil Procedure 65 authorizes the courts to issue preliminary injunctions, but it does not identify the standards the Court must apply in deciding whether or not to grant a request for a preliminary injunction.[4] The Eighth Circuit Court of Appeals has done so, however, explaining that the standards involve consideration of what are usually described in this Circuit as the "*Dataphase* factors": "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Ng v. Bd. of Regents of Univ. of Minnesota*, 64 F.4th 992, 997 (8th Cir. 2023) (quoting *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc)); *see also Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 665 (8th Cir. 2022) (explaining that "the standard for analyzing a motion for a temporary restraining order is the same as [the standard for analyzing] a motion for a preliminary injunction"). This formulation is similar but not identical to the formulation of the pertinent factors by the Supreme Court more than a quarter century later in *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008): *Winter* states that to obtain either a TRO or a preliminary injunction, "'[a] plaintiff . . . must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.'" *Winter*, 555 U.S. at 20 (bracketed numbers inserted); *see also Tumey*, 27 F.4th at 664 (quoting *Winter*, 555 U.S. at 20, and also citing *Dataphase*, 640 F.2d at 114). No single factor is

---

[4] Rule 65 provides, in part, "The court may issue a preliminary injunction only on notice to the adverse party." Fed. R. Civ. P. 65(a)(1). Rule 65(a)(2) also provides for consolidation of the preliminary injunction hearing with trial on the merits. Fed. R. Civ. P. 65(a)(2). The adverse party here, NavSav, has received notice of the request for a preliminary injunction; no party has suggested that the preliminary injunction hearing should be consolidated with trial on the merits; and the Court does not find such consolidation to be appropriate.

dispositive, whether the factors are drawn from *Winter, see Tumey*, 27 F.4th at 665, or from *Dataphase*, *see Ng*, 64 F.4th at 997.[5]

In addition to these factors, it is well to remember that "[a] preliminary injunction is an extraordinary remedy, and the burden of establishing the propriety of an injunction is on the movant," here Beber and Roach, respectively. *Ng*, 64 F.4th at 997 (quoting *Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 699 (8th Cir. 2021)); *Tumey*, 27 F.4th at 664. Because it is an extraordinary remedy, it is "never awarded as of right." *H&R Block, Inc. v. Block, Inc*., 58 F.4th 939, 946 (8th Cir. 2023) (quoting *Progressive Techs., Inc. v. Chaffin Holdings, Inc*., 33 F.4th 481, 485 (8th Cir. 2022), in turn quoting *Winter*, 555 U.S. at 24). Furthermore, "[t]he goal of a preliminary injunction is 'to preserve the status quo until the merits are determined.'" *Ng*, 64 F.4th at 997 (quoting *Dataphase*, 640 F.2d at 113); *Tumey*, 27 F.4th at 664. Consequently, a court must be "mindful that a movant carries a 'heavier' burden when granting a preliminary injunction has the effect of awarding the movant substantially the relief it could obtain after a trial on the merits." *H&R Block*, 58 F.4th at 946.

This is a case in which granting the requested preliminary injunction has the effect of awarding the movants substantially the relief they could obtain after a trial on the merits finding the restrictive covenants at issue unenforceable. Thus, the Court will be mindful of the movants' "heavier" burden, *id*., as it considers the relevant factors in turn.

---

[5] Although *Winer* and *Dataphase* identify the same considerations, the two decisions address those factors in different order and slightly different language, so that it may be appropriate to refer to the "*Winter* factors" rather than the "*Dataphase* factors." *Compare Winter*, 555 U.S. at 20, *with Dataphase*, 640 F.2d at 20.

### B.  Likelihood of Success on the Merits

### 1.    Applicable Standards

As to the first factor under *Winter* and the third factor under *Dataphase*, the Eighth Circuit Court of Appeals has stated "that '[w]hile no single [*Winter*] factor is determinative, the probability of success factor is the most significant.'" *Tumey*, 27 F.4th at 665 (quoting *Carson v. Simon*, 978 F.3d 1051, 1059 (8th Cir. 2020) (cleaned up)). This factor requires the movant to demonstrate "at least a 'fair chance of prevailing.'" *Wildhawk Invs., LLC v. Brava I.P., LLC*, 27 F.4th 587, 593 (8th Cir. 2022) (quoting *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1041 (8th Cir. 2016)). The likelihood of success on the merits necessarily looks at the law applicable to the claims that are the basis for preliminary injunctive relief. *See, e.g., H&R Block*, 58 F.4th at 946 (beginning its analysis of probability of success on the merits with a recitation of trademark infringement law); *301, 712, 2103 & 3151 LLC v. City of Minneapolis,* 27 F.4th 1377, 1383 (8th Cir. 2022) (analyzing likelihood of success in light of the elements of the movant's "takings" claim). In considering the "likelihood of success on the merits," the Court is not predetermining which party will prevail; again, the Court is only considering whether the movants' showing is sufficient to demonstrate that they have "at least a 'fair chance of prevailing.'" *Wildhawk Invs., LLC*, 27 F.4th at 593 (quoting *Richland/Wilkin Joint Powers Auth.*, 826 F.3d at 1041).

### 2.    The Applicable Law is Nebraska Law not Texas Law

Before the Court can determine whether Beber and Roach are likely to succeed on the merits of their claims under the applicable law, *see H&R Block*, 58 F.4th at 946; *301, 712, 2103 & 3151 LLC,* 27 F.4th at 1383, the Court must determine what state's law is applicable. Beber and Roach argue that notwithstanding the choice-of-law and forum-selection provisions in their April Agreements, this Court should apply Nebraska law and public policy because Nebraska has

the greater interest in this litigation. Filing 4 at 13. NavSav argues that Beber and Roach understood and agreed that Texas law applied to any dispute under the April Agreements. Filing 7 at 8.

> a. Nebraska Choice-of-Law Rules must be Applied Because of an "Actual Conflict" between Nebraska Law and Texas Law

When federal jurisdiction is based on diversity—as it is here, *see* Filing 1 at 1 (¶ 3)— federal courts apply the forum's choice-of-law rules. *Rey v. Gen. Motors, LLC*, No. 22-1563, 2023 WL 5157580, at *4 (8th Cir. Aug. 11, 2023). This is true even when there is a choice-of-law provision in a contract involved in the parties' dispute. *See C.H. Robinson Worldwide, Inc. v. Traffic Tech, Inc.*, 60 F.4th 1144, 1149 (8th Cir. 2023) (explaining that a court must first examine the forum state's choice-of-law rules before deciding whether to enforce a choice-of-law provision in a contract).

As the Nebraska Supreme Court has explained,

> In answering any choice-of-law question, a court first asks whether there is any real conflict between the laws of the states. An actual conflict exists when a legal issue is resolved differently under the law of two states.

*Fredericks Peebles & Morgan LLP v. Assam*, 915 N.W.2d 770, 780 (Neb. 2018) (citing *O'Brien v. Cessna Aircraft Co.*, 903 N.W.2d 432, 458 (Neb. 2017)). Determining whether there is an actual conflict between the laws of the states is appropriate "before [a court] entangl[es] itself in messy issues of conflict of laws." *Am. Nat. Bank v. Medved*, 801 N.W.2d 230, 238 (Neb. 2011). The Nebraska Supreme Court has also explained, "Once a court determines there is a conflict of law between two states, the next step is to classify the nature of the specific conflict issue, 'because different choice-of-law rules apply depending on whether the cause of action sounds in contract or in tort.'" *O'Brien*, 903 N.W.2d at 459 (quoting *Johnson v. United States Fidelity & Guar. Co.*, 696 N.W.2d at 437 (Neb. 2005)).

19

In this case, Beber and Roach argue—and the Court finds—that there is a real conflict between the laws of Nebraska, the forum state, and Texas, the state NavSav asserts provides the governing law via a choice-of-law provision in the April Agreements. *Compare* Filing 4 at 6–7, *with* Filing 7 at 8–9. As the Nebraska Supreme Court has explained,

> This court has long held that it is not the function of the courts to reform a covenant not to compete in order to make it enforceable. We have declined to apply the "'blue pencil' rule," which allows for the reformation of covenants to make them enforceable, stating that "we must either enforce [a covenant] as written or not enforce it at all." We have found that "reformation is tantamount to the construction of a private agreement and that the construction of private agreements is not within the power of the courts."

*Unlimited Opportunity, Inc. v. Waadah*, 861 N.W.2d 437, 441 (Neb. 2015) (quoting *CAE Vanguard, Inc. v. Newman*, 518 N.W.2d 652, 655–656 (Neb. 1994)). In contrast, a Texas statue provides in pertinent part,

> (c) If the covenant is found to be ancillary to or part of an otherwise enforceable agreement but contains limitations as to time, geographical area, or scope of activity to be restrained that are not reasonable and impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee, the court shall reform the covenant to the extent necessary to cause the limitations contained in the covenant as to time, geographical area, and scope of activity to be restrained to be reasonable and to impose a restraint that is not greater than necessary to protect the goodwill or other business interest of the promisee and enforce the covenant as reformed, except that the court may not award the promisee damages for a breach of the covenant before its reformation and the relief granted to the promisee shall be limited to injunctive relief.

Tex. Bus. & Com. Code Ann. § 15.51(c). This is a case in which "[a]n actual conflict exists" because "a legal issue," that is, whether a restrictive covenant can be reformed, "is resolved differently under the law of two states." *Fredericks Peebles & Morgan LLP*, 915 N.W.2d at 780 (citation omitted). Thus, Nebraska choice-of-law rules apply.

**b.** The Cases Are Properly Classified as Contractual

Because the Court has determined that there is an "actual conflict" in the laws of Texas and Nebraska pertinent to their dispute, the Court's next step is "to classify the nature of the

20

specific conflict issue, 'because different choice-of-law rules apply depending on whether the cause of action sounds in contract or in tort.'" *O'Brien*, 903 N.W.2d at 459 (quoting *Johnson*, 696 N.W.2d at 437). Although the parties' dispute involves a tort claim, tortious interference with contractual relations, *see* Filing 1-1 at 199 (third cause of action), the gravamen of the parties' dispute is a contract claim involving non-competition and non-solicitation agreements. *See* Filing 1-1 at 184 (setting out the first claim as one for declaratory judgment that parts of the NavSav April Agreement, including without limitation the restrictive covenants, are invalid and unenforceable under Nebraska law, which Beber asserts applies); Filing 1-1 at 198 (setting out the second claim as one seeking temporary and permanent injunctions "restraining NavSav from (i) enforcing or threatening to enforce the restrictive covenants contained in the NavSav and Universal Agreements and (ii) bringing suit against Beber in Texas and applying Texas law to enforce the restrictive covenants contained in the NavSav and Universal Agreements"). Thus, Nebraska's choice-of-law rules for contract cases apply here.

      **c.** Nebraska Choice-of-Law Rules for Contract Cases Require Application of Nebraska Law

The Nebraska Supreme Court observed,

> We have recognized that persons residing in different states may select the law of either state to govern their contract and that the parties' choice of law will govern. This principle is consistent with Restatement (Second) of Conflict of Laws § 187[.]

*Medved*, 801 N.W.2d at 236. The Nebraska Supreme Court expressly adopted § 187. *Id.*

That is not to say that the parties' choice of law in a contract will always govern, because Restatement (Second) of Conflict of Laws § 187 states exceptions. Specifically, § 187 provides:

> (1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.

> (2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either
>
>> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
>>
>> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

Restatement (Second) of Conflict of Laws § 187 (1971); *Medved*, 801 N.W.2d at 236–237 (quoting this provision). As the Nebraska Supreme Court has explained,

> Under the Restatement, in the absence of an effective choice of law by the parties, a court is to consider several contacts in determining the law applicable to an issue. These contacts include (1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation, and place of business of the parties.

*In re Est. of Greb*, 848 N.W.2d 611, 622 (Neb. 2014) (citing Restatement (Second) of Conflict of Laws § 188(2) (1971)).

Neither Beber and Roach, on the one hand, nor NavSav, on the other hand, argues that § 187(1) applies in this case. The analysis in *Medved* as to why § 187 dictated application of Nebraska law, and whether that conclusion was based on § 187(1) or § 187(2), is not clear, where the parties' contract specifically provided that it was to be governed by Nebraska law. 801 N.W.2d at 237. Nevertheless, this Court is not left wholly without guidance.

In *DCS Sanitation Mgmt., Inc. v. Castillo*, 435 F.3d 892 (8th Cir. 2006), the Eighth Circuit Court of Appeals explained that the district court had applied § 187(2) without analyzing whether § 187(1) applied. 435 F.3d at 896. The Eighth Circuit found that this omission was

problematic, because "[s]ection 187(2) applies only when section 187(1) does not govern." *Id.*

(citing Restatement § 187, comment d). The court then held,

> Section 187(1) is inapplicable in this case, because, under Nebraska law, the parties could not have resolved to apply Ohio law even with an explicit provision. *See CAE Vanguard, Inc. v. Newman*, 246 Neb. 334, 518 N.W.2d 652, 656 (1994) (holding "[t]he provision of the agreement which states that a court may reform the covenant is of no effect. Private parties may not confer upon the court powers which it does not possess."); *see also Baxter Intern., Inc. v. Morris*, 976 F.2d 1189, 1196 (8th Cir.1992).

*Castillo*, 435 F.3d at 896. Likewise, in this case, the Court cannot apply Texas law, even though

it is the law explicitly chosen in the parties' April Agreements, because this Court cannot reform

the covenants at issue under Nebraska law even if the Court would have that power under Texas

law. *Id.* Thus, the Court's analysis will focus on § 187(2).

In *Castillo*, the Eighth Circuit held that § 187(2)(a) applied because the requirement that

"the chosen state has no substantial relationship to the parties or the transaction and there is no

other reasonable basis for the parties' choice" was met. *Id.* This was so for the following reasons:

> Nebraska has a substantial relationship to the parties and the transaction, because the former employees and DCS entered into the Agreements in Nebraska, the services at issue were to be performed in Nebraska, the former employees reside in Nebraska, the prohibition of the noncompete clause directly and materially affects employment in Nebraska, and DCS does business in Nebraska. Nebraska clearly possesses a direct and substantial interest in the employment of its citizens. The only relationship between Ohio and the parties is the location of DCS's corporate headquarters and principal place of business in Ohio.

*Castillo*, 435 F.3d at 896. The Eighth Circuit found these factors were relevant, because they

were considered by the Nebraska Supreme Court in *Powell v. Am. Charter Fed. Sav. & Loan

Ass'n*, 514 N.W.2d 326, 332 (Neb. 1994). *Castillo*, 435 F.3d at 896. In *Powell*, the Nebraska

Supreme Court drew these factors from Restatement (Second) of Conflict of Laws § 188. 514

N.W.2d at 331 (citing § 188 and *Shull v. Dain, Kalman & Quail, Inc.*, 267 N.W.2d 517, 520

(Neb. 1978)). In *Castillo*, the Eighth Circuit Court of Appeals concluded that "[u]nder these

circumstances, the district court properly concluded Ohio has no substantial relationship to the parties or the transaction, and Nebraska has a greater material interest in the Agreements." *Id.*

For precisely the same reasons, this Court now concludes that Nebraska has a greater material interest in the April Agreements than Texas does. There is no evidence that Beber and NavSav or Roach and NavSav entered into the April Agreements in Texas rather than Nebraska, where Beber and Roach lived and worked. *See id.*; *see also* Filing 1-1 at 66 (¶¶ 19–20). The services at issue were to be performed by Beber and Roach at least partly in Nebraska and never in Texas. *See id.*; *see also* Filing 1-1 at 69 (¶ 28). Beber and Roach reside in Omaha, Douglas County, Nebraska. *See id.*; *see also* Filing 1-1 at 176. Moreover, the prohibition of the noncompete clause directly and materially affects employment in Nebraska. *See id.*; *see also* Filing 1-1 at 70 (¶ 40). Finally, NavSav does business in Nebraska. *See id.*; *see also* Filing 1-1 at 64–65 (¶¶ 5–14).

In *Castillo*, the Eighth Circuit concluded that the conditions set out in § 187(2)(b) were also met. *Id.* The court explained,

> Under section 187(2)(b), application of the chosen law is precluded if "application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state" when the factors articulated in section 188 are applied. Restatement § 187(2)(b). Nebraska and Ohio courts have materially different approaches to the reformation of unreasonable noncompete agreements. In Nebraska, if a court determines a noncompete agreement is unreasonable, the court will not reform the noncompete agreement in order to make it enforceable. *H & R Block Tax Servs., Inc., v. Circle A Enters., Inc.*, 269 Neb. 411, 693 N.W.2d 548, 552 (2005). Contrary to the Nebraska courts' approach, Ohio courts are empowered to reform overly broad or unreasonable noncompete agreements to make them reasonable. *Raimonde v. Van Vlerah*, 42 Ohio St.2d 21, 325 N.E.2d 544, 547 (1975). The district court correctly recognized that because Nebraska courts expressly have rejected judicial reformation of noncompete agreements, application of Ohio law would violate a fundamental policy of Nebraska law.

*Castillo*, 435 F.3d at 896–97.

Again, precisely the same is true here. The Eighth Circuit identified as a fundamental policy of the state of Nebraska that a noncompete agreement that is unreasonable cannot be reformed in order to make it enforceable. *Id.* at 897; *see also Waadah*, 861 N.W.2d at 441 (explaining that "we must either enforce [a covenant] as written or not enforce it at all" (quoting *CAE Vanguard, Inc.*, 518 N.W.2d at 655–656)). On the other hand, Texas (like Ohio) allows "blue-penciling" of restrictive covenants to make them reasonable. *See id.*; *see also* Tex. Bus. & Com. Code Ann. § 15.51(c). "[B]ecause Nebraska courts expressly have rejected judicial reformation of noncompete agreements, application of [Texas] law would violate a fundamental policy of Nebraska law." *Id.*

After the comparable analysis in *Castillo*, the Eighth Circuit concluded, "Because Nebraska has a greater material interest in the Agreements and application of Ohio law would violate a fundamental policy of Nebraska law, we hold the district court correctly applied Nebraska law to the question of the validity and enforceability of the noncompete agreements." *Id.* Likewise, it follows that Nebraska law applies to the parties' dispute here rather than Texas law, even though Texas law is identified in the choice-of-law provisions of Beber's and Roach's April Agreements. *Id.*

3.    *The Enforceability of the Restrictive Covenants under Nebraska Law*

a.    Applicable Standards

Not only does Nebraska law apply, the April Agreements are unenforceable under Nebraska law. Beber and Roach argue that the April Agreements are unenforceable because the covenants were not limited to customers with whom they had a relationship while at NavSav and the April Agreements cannot be reformed under Nebraska law. Filing 4 at 16, 20. At the preliminary injunction hearing, Beber and Roach added that the April Agreements were also unreasonably overbroad because they include the books of business of NavSav's affiliates and

related entities as well as NavSav and because they are excessive in duration compared to the thirteen months or so they worked for NavSav. While NavSav expressly asserts that the restrictive covenants in the April Agreements are enforceable under Texas law, *see* Filing 7 at 21–25, it never expressly argues that the April Agreements are enforceable under Nebraska law. *See generally* Filing 7. Instead, NavSav shifts its argument to the enforceability of the Universal Agreements under Nebraska law. Filing 7 at 25–26. The Court will address issues related to the Universal Agreements below. The first question is the enforceability of the April Agreements, however.

Under Nebraska law, "[a]n employer has a legitimate business interest in protection against a former employee's competition by improper and unfair means, but [it] is not entitled to protection against ordinary competition from a former employee." *Prof'l Bus. Servs. Co. v. Rosno*, 680 N.W.2d 176, 184 (Neb. 2004); *see also Castillo*, 435 F.3d at 897 (quoting this statement from *Rosno*). To put it another way, "while not favorites of the law, partial restraints are not deemed to be unenforcible [sic] when they are ancillary to a contract of employment and are apparently necessary to afford fair protection to the employer." *Gaver v. Schneider's O.K. Tire Co.*, 856 N.W.2d 121, 127 (Neb. 2014) (quoting *Securities Acceptance Corp. v. Brown*, 106 N.W.2d 456, 462 (Neb. 1960)). Indeed, "Nebraska courts are generally more willing to uphold promises to refrain from competition made in the context of the sale of goodwill as a business asset than those made in connection with contracts of employment." *Waadah*, 861 N.W.2d at 443. Thus, "[w]hether a noncompete clause is valid and enforceable requires [a court] to categorize the covenant as either an employment contract or the sale of goodwill." *Id.*

Nevertheless,

[r]egardless of the context [*i.e.*, whether employment or the sale of a business and its goodwill], a partial restraint of trade such as a covenant not to compete must

26

> meet three general requirements to be valid. First, the restriction must be reasonable in the sense that it is not injurious to the public. Second, the restriction must be reasonable in the sense that it is no greater than reasonably necessary to protect the employer in some legitimate business interest. Third, the restriction must be reasonable in the sense that it is not unduly harsh and oppressive on the party against whom it is asserted.

*Waadah*, 861 N.W.2d at 443 (concluding that the proper standard in that case was the one used for sale of goodwill); *Gaver*, 856 N.W.2d at 127 (listing the same considerations in an employment case); *see also Castillo*, 435 F.3d at 897 (noting that Nebraska imposes these requirements, citing *Rosno*, 680 N.W.2d at 184).

The Nebraska Supreme Court has suggested that it is often best to consider the second requirement "and initially determine if the restraint is in aid of some legitimate interest of the employer." *Gaver*, 856 N.W.2d at 127–28. Furthermore,

> In the past, we have determined that covenants not to compete are valid and enforceable where they were reasonably limited to restricting the former employee from contacting customers with whom the former employee had had personal contact while employed by the former employer and where they contained reasonable temporal and geographical restrictions.

*Gaver*, 856 N.W.2d at 128 (citing cases). Likewise, in *Castillo*, the Eighth Circuit explained, "A noncompete agreement 'may be valid only if it restricts the former employee from working for or soliciting the former employer's clients or accounts with whom the former employee actually did business and has personal contact.'" 435 F.3d at 897 (quoting *Polly v. Ray D. Hilderman & Co.*, 407 N.W.2d 751, 756 (Neb. 1987)).

**b.** The April Agreements are Unenforceable under Nebraska Law

Beginning with the initial question of whether "the restraint is in aid of some legitimate interest of the employer," the non-competition provision in the April Agreement for each Plaintiff, § 4.(a)., is "ancillary to a contract of employment and [is] apparently necessary to afford fair protection to the employer." *Gaver*, 856 N.W.2d at 127–28 (second requirement).

Standing alone, it also does not appear to be "unduly harsh and oppressive on the party against whom it is asserted." *Waadah*, 861 N.W.2d at 443; *Gaver*, 856 N.W.2d at 127. This is so, because it "contain[s] reasonable temporal and geographical restrictions," *Gaver*, 856 N.W.2d at 128, where it applies for "a period of one (1) year from the date of Employee's last date of employment with NavSav, and within a five (5) mile radius of Employee's primary office location during Employee's employment." Filing 1-1 at 77–78. Indeed, Beber and Roach both aver that their new place of business with UNICO is more than five miles from their former Omaha office while employed with NavSav, so they are not in violation of this provision even if it is enforceable. Filing 1-1 at 70 (¶ 40). However, the non-competition provision does not satisfy the first requirement under Nebraska law where it "is . . . injurious to the public" because it does not stand alone; it is linked with non-solicitation provisions that violate Nebraska public policy. *See id.* at 127 (third requirement is that the covenant "is not injurious to the public").

The non-solicitation provision in the April Agreement is not enforceable because it is not "reasonably limited to restricting the former employee from contacting customers with whom the former employee had had personal contact while employed by the former employer." *Gaver*, 856 N.W.2d at 128; *accord Castillo*, 435 F.3d at 897 (stating that under Nebraska law, "[a] noncompete agreement may be valid only if it restricts the former employee from working for or soliciting the former employer's clients or accounts with whom the former employee actually did business and has personal contact" (internal quotation marks and citation omitted)). Instead, the non-solicitation provision, § 4.(b)., precludes soliciting "any customer that is a part of any book of business owned by NavSav or a NavSav related or affiliated entity, or divert[ing] (or attempt[ing] to divert) any customer that is a part of any book or business owned by NavSav or a NavSav related or affiliated entity from continuing to do business with Employer for a period of

three (3) years from Employee's last date of employment with Employer." Filing 1-1 at 78. This provision barring contact with "any customer that is a part of any book of business owned by NavSav" greatly exceeds the permissible scope of customers an employee may be precluded from contacting by a restrictive covenant under Nebraska law. *Gaver*, 856 N.W.2d at 128; *Castillo*, 435 F.3d at 897. Still further there is no evidence that Beber or Roach ever solicited any customers of any of NavSav's affiliates identified in § 21 of the April Agreements. Filing 1-1 at 84. Thus, the inclusion of affiliates' customers is not reasonably necessary to protect NavSav's legitimate business interests. *Id.*

The Court finds that a three-year bar on contacts with NavSav customers, even if Beber and Roach had once had personal contact with them while working for NavSav, appears to be an excessive—perhaps even punitive—temporal bar, where Beber and Roach worked for NavSav only for about thirteen months. *Id.* (stating that restrictive covenants must not have unreasonable temporal limitations). The non-solicitation provision applicable to employees in § 4.(c). of the April Agreement appears even more excessive because it is a five-year bar. Filing 1-1 at 78.

Again, at least for purposes of a preliminary injunction, the Court does not believe it can "blue-pencil" the April Agreement to leave just the non-competition provision with its reasonable one-year and five-mile limitations standing without contradicting Nebraska public policy. *See Waadah*, 861 N.W.2d at 441 (explaining that "we must either enforce [a covenant] as written or not enforce it at all" (quoting *CAE Vanguard, Inc.*, 518 N.W.2d at 655–656)).[6]

Thus, Beber and Roach have not just "a fair chance of prevailing," *see Wildhawk Invs.*, 27 F.4th at, 593 (defining likelihood of success), but a high probability of success on the merits

---

[6] Because the Court concludes at least for purposes of a preliminary injunction that the April Agreement is not enforceable even if there was consideration for that agreement, the Court will not address Beber's and Roach's further argument that there was no consideration for the April Agreement making it unenforceable.

of their claim that the April Agreements are unenforceable. Therefore, this *Winter* factor weighs very heavily in favor of granting the requested preliminary injunction against enforcement of the April Agreements.

           **c.**   **The Universal Agreements Are Unenforceable Because They Are Unassignable under Nebraska Law**

NavSav argues that even though Beber and Roach base their arguments for preliminary injunctions exclusively on the April Agreements, their "likelihood of success" should also take into consideration the restrictive covenants in the Universal Agreements that were assigned to NavSav when it purchased Universal. Filing 7 at 25. The Court notes that Beber and Roach base the claims in their Complaints on the unenforceability of both the April Agreements and the Universal Agreements. *See* Filing 1-1 at 198. Thus, it is appropriate to consider their likelihood of success on their claim that the Universal Agreements are also unenforceable under Nebraska law.

The document illustrating the purported assignment of the Universal Agreements to NavSav is at Filing 8-3. NavSav argues that the Universal Agreements restrict Beber's and Roach's post-employment conduct to the extent that they cannot use NavSav's confidential information or solicit NavSav customers with whom they worked during their employment. Filing 7 at 25. NavSav argues that such a restriction is enforceable under Nebraska law. Filing 7 at 25 (citing *Aon Consulting, Inc. v. Midlands Fin. Benefits, Inc*., 748 N.W.2d 626, 638 (Neb. 2008), and *Chambers-Dobson v. Squier*, 472 N.W.2d 391, 399–402 (Neb. 1991)). Among other things, Beber and Roach argue that the Universal Agreement cannot be assigned to NavSav and does not apply to Universal's successors or assignees. Filing 16 at 13. They argue that there is no language in the Universal Agreement that applies to Universal's successors and assignees and

the covenants are directed exclusively to Universal. Filing 16 at 13. They argue further that personal services contracts cannot be assigned as a matter of law. Filing 16 at 13.

The Court agrees with Beber and Roach that the Universal Agreements are not assignable. First, *Aon Consulting*, on which NavSav relies actually applies Maryland law to the question of the assignability of a non-competition agreement. 748 N.W.2d at 637–38. NavSav has not demonstrated that there is a Nebraska statute or decision of the Nebraska Supreme Court that is similar to Maryland's statute, MD Code Corps. & Ass'ns § 3-114. *See Aon Consulting,* 748 N.W.2d at 637 ("We agree with those cases which hold, under statutes similar to Maryland's, that a covenant not to compete is an asset of a corporation which passes by operation of law to a successor corporation as the result of a merger, regardless of whether the agreement would otherwise be assignable. ").

On the other hand, in *Griffeth v. Sawyer Clothing, Inc.*, 276 N.W.2d 652 (Neb. 1979), the Nebraska Supreme Court found questions of fact as to the intent to assign a non-competition agreement, that is, whether it was intended that the non-competition agreement was a personal obligation not to be assigned, even though the contract for sale of the business purported to assign rights to the buyer. 276 N.W.2d at 654. The Court ultimately concluded,

> We believe that the better rule in the assignability of such contracts would be to limit that assignability strictly to the intent of the parties as disclosed by the language of the instrument if it is complete and unambiguous. Where the language in the contract regarding assignment is susceptible of more than one construction, or is vague or ambiguous, extrinsic evidence may be received for the purpose of determining the intent of the parties.

*Griffeth*, 276 N.W.2d at 655.

There is no hint of any intent to allow assignment of the restrictive covenants in the Universal Agreements, so limiting assignability strictly to the intent disclosed by the language of the instrument, the Court finds no assignment was intended. *Id.* There simply is no language in

the Universal Agreements that obligates Beber or Roach to Universal's assignees or successors. *See* Filing 8-4 (proprietary information agreement as to Roach); Filing 8-5 (non-solicitation agreement as to Roach); Filing 8-6 (non-solicitation agreement as to Beber). This conclusion that the restrictive covenants in the Universal Agreements were not intended to be assigned is consistent with later decisions of the Nebraska Supreme Court holding that assignments for matters of personal trust or confidence or for personal services are not permissible. *See, e.g., Millard Gutter Co. v. Shelter Mut. Ins. Co*., 980 N.W.2d 420, 433 (Neb. 2022) ("[A]lthough the law generally supports the assignability of rights, it does not permit assignments for matters of personal trust or confidence, or for personal services.").

NavSav did not rely on the Universal Agreements as to Beber and Roach as the basis for its own attempt to enforce restrictive covenants in the Texas action. There is no mention of the Universal Agreements in NavSav's Third Amended Petition. *See generally* Filing 1-1 at 91–106. There is mention only that NavSav "purchased the assets (i.e. insurance policies) of Universal Group, Ltd.," and that Roach and Beber are "former employees of Universal" who then executed the April Agreement with NavSav. *See* Filing 1-1 at 94 (¶¶ 10–11).

The Court rejects NavSav's attempt to change the focus for Beber's and Roach's likelihood of success from the April Agreements they have with NavSav to agreements Beber and Roach had with NavSav's predecessor and alleged assignor Universal. Instead, the Court reiterates its conclusion that the likelihood of success factor weighs very heavily in favor of granting the requested preliminary injunction against enforcement of the April Agreements.

## C.  Irreparable Harm

*1.     Applicable Standards*

The second factor under *Winter* and the first factor under *Dataphase* is "irreparable harm." *Winter*, 555 U.S. at 20; *Dataphase*, 640 F.2d at 114. As the Eighth Circuit Court of Appeals explained in *Ng*,

> "To establish the need for a preliminary injunction, the movant must show more than the mere possibility that irreparable harm will occur. A movant must show he is 'likely to suffer irreparable harm in the absence of preliminary relief.'" *Sessler v. City of Davenpor*t, 990 F.3d 1150, 1156 (8th Cir. 2021) (quoting *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008)).

*Ng*, 64 F.4th at 997; *Tumey*, 27 F.4th at 664–65 (explaining that to obtain a preliminary injunction, the movant must show that "irreparable injury is likely in the absence of an injunction, not merely a 'possibility' of irreparable harm before a decision on the merits can be rendered" (quoting *Winter*, 555 U.S. at 20)). Indeed,

> To demonstrate irreparable harm, [the movant] must show harm that is certain and great and of such imminence that there is a clear and present need for equitable relief. In other words, the harm must not only be more than the mere possibility of irreparable harm, it also must be more than mere speculation.

*H&R Block*, 58 F.4th at 951 (internal quotation marks and citations omitted).

Somewhat more specifically, "[i]rreparable harm occurs when a party has no adequate remedy at law." *Sleep No. Corp. v. Young*, 33 F.4th 1012, 1018 (8th Cir. 2022) (quoting *General Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009)). Thus, for example, "'[e]conomic loss, on its own, is not an irreparable injury so long as the losses can be recovered'"—*i.e*., can be recompensed by money damages. *Wildhawk Invs*., LLC, 27 F.4th at 597 (quoting *DISH Network Serv. L.L.C. v. Laducer*, 725 F.3d 877, 882 (8th Cir. 2013)). "The failure of a movant to show irreparable harm is an 'independently sufficient basis upon which to

deny a preliminary injunction.'" *Sessler v. City of Davenport*, 990 F.3d 1150, 1156 (8th Cir. 2021) (quoting *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003)).

      2.      *Plaintiffs Have Shown Sufficient Threat of Irreparable Harm to Warrant a Preliminary Injunction*

      Because failure to satisfy this factor is independently sufficient to defeat a request for a preliminary injunction, *see Sessler*, 990 F.3d at 1156, the Court will begin by summarizing the parties' arguments on this factor. Beber and Roach argue that they will suffer irreparable harm in the absence of a preliminary injunction in the form of restraint on trade and commerce in Nebraska by applying Texas law and public policy that are inconsistent with Nebraska law and public policy; impairment or elimination of their ability to earn a living and support their families and themselves; imposition of great expense to defend against the Texas case in Texas; and a potential judgment in Texas regarding the post-employment restrictive covenants contained in the NavSav Agreement that will conflict with Nebraska law and public policy. Filing 4 at 24–24.

      In response, NavSav argues that none of Plaintiffs' allegedly "irreparable harms" is sufficient to support a preliminary injunction. Filing 7 at 11. NavSav argues that Plaintiffs are not prevented from earning a living, just prevented from doing so in violation of their restrictive covenants. Filing 7 at 11. NavSav also points out that the Texas restraining order is no longer in effect, so they are not currently restrained from any conduct. Filing 7 at 12. NavSav argues that case law shows that defending against litigation and the costs of doing so are not irreparable harms. Filing 7 at 12. Indeed, NavSav points out that monetary losses rarely constitute irreparable harm within the meaning of this preliminary injunction factor. Filing 7 at 12.

In reply, Plaintiffs emphasize the irreparable harm from the restraint on trade and commerce in Nebraska from application of Texas law and policy that is inconsistent with Nebraska law and public policy. Filing 16 at 19.

As set out above, "'[e]conomic loss, on its own, is not an irreparable injury so long as the losses can be recovered'"—*i.e.*, can be recompensed by money damages. *Wildhawk Invs., LLC*, 27 F.4th at 597 (quoting *DISH Network Serv. L.L.C*, 725 F.3d at 882). Thus, impairment or elimination of Plaintiffs' ability to earn a living and support their families and themselves and costs of litigation generally are not sufficient to warrant a preliminary injunction, because such monetary losses can be recompensed by monetary damages. *Id.* More specifically, when an employee is wrongfully terminated—and the Court believes when an employee is wrongfully prevented from working—his or her "temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury." *Adam-Mellang v. Apartment Search, Inc.*, 96 F.3d 297, 300 (8th Cir. 1996) (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974)).

At the preliminary injunction hearing, Beber and Roach relied on the Court's own decision in *Bryant v. Nationwide Anesthesia Services, Inc.*, Case No. 8:21-cv-335, 2021 WL 3912264 (D. Neb. Sept. 1, 2021), as authority for holding that lost income can constitute irreparable harm. In that case, the Court observed,

> Bryant had shown a threat of irreparable harm should the court fail to issue the temporary restraining order. She alleges she will be forced to resign from her current employment and will be unable to seek further employment in her specialized area. Filing 1 at 10. She claims this will result in her being unable to earn a living. Filing 1 at 10. Any such harm would be irreparable due to Bryant's complete inability to obtain employment in the entire field of her expertise. Thus, Bryant had shown a likelihood of more than financial loss but rather irreparable harm to her very livelihood and her opportunity to pursue employment in her field of expertise.

*Bryant*, 2021 WL 3912264, at *5. *Bryant* is distinguishable, however. Even if the April Agreements were enforceable, they would not force Beber or Roach to resign from their current

employment with UNICO, they would not make Beber and Roach unable to seek further employment in their specialized area, and they would not make Beber and Roach unable to earn a living. *See id.*

On the other hand, the Court is more persuaded by the conflict between enforcement of the restrictive covenants and Nebraska law and public policy as an "irreparable harm." In *MacGinnitie v. Hobbs Grp., LLC*, 420 F.3d 1234 (11th Cir. 2005), the Eleventh Circuit Court of Appeals considered a request for injunctive relief from restrictive covenants in an employee's contract with an insurance brokerage firm. *MacGinnitie*, 420 F.3d at 1237. The Eleventh Circuit concluded that the district court had erred in rejecting injunctive relief for lack of irreparable harm, as follows:

> Furthermore, MacGinnitie has shown irreparable harm which cannot be undone through monetary remedies, in the form of unenforceable restrictions on his access to customers, employees, and information. These injuries are in the form of lost opportunities, which are difficult, if not impossible, to quantify. Georgia public policy is clear that restrictive covenants in employment contracts are disfavored as potential restraints of trade which tend to lessen competition. Because of this public policy, the Georgia courts and this court have not hesitated to find irreparable harm in cases involving covenants not to compete.

*MacGinnitie*, 420 F.3d at 1242 (citations omitted). Similarly, in the case now before the Court, as explained above, Nebraska has a clear public policy against overbroad restrictive covenants in employment contracts as restraints on trade and will not reform them to impose only reasonable limitations. *See Waadah*, 861 N.W.2d at 441; *CAE Vanguard, Inc.*, 518 N.W.2d at 655–656. Although Plaintiffs have not cited any Nebraska case that has granted a preliminary injunction on the ground that a restrictive covenant would inflict irreparable harm because it would violate Nebraska public policy, this Court predicts that the Nebraska Supreme Court would not hesitate to do so when this aspect of Nebraska public policy is so well-established.

36

Plaintiffs have also established sufficient threat of irreparable harm to warrant issuance of a preliminary injunction.

### D.  The Balance of Harms

The third *Winter* factor and the second *Dataphase* factor considers the "balance of equities" or the "balance of harms." *Winter*, 555 U.S. at 20; *Dataphase*, 640 F.2d at 114. This factor requires the court to consider the state of the balance between the harm to the movant and the injury that granting the injunction will inflict on other litigants in the case. *Eggers v. Evnen*, 48 F.4th 561, 564 (8th Cir. 2022); *MPAY Inc. v. Erie Custom* Comput. *Applications, Inc.*, 970 F.3d 1010, 1020 (8th Cir. 2020). In other words, this factor asks whether "the balance of equities tips in [the movant's] favor." *Tumey*, 27 F.4th at 664 (internal quotation marks omitted). To prevail, the movant must show that "the balance of equities so favors [the movant] that justice requires the court to intervene to preserve the status quo until the merits are determined." *Sessler*, 990 F.3d at 1157 (quoting *Powell v. Noble*, 798 F.3d 690, 702–03 (8th Cir. 2015), in turn quoting *Dataphase*, 640 F.2d at 113).

Plaintiffs argue that while they face a threat of irreparable harm in the absence of a preliminary injunction, NavSav faces only a minimal threat of harm if a preliminary injunction is issued. Filing 4 at 22. They argue that NavSav will be able to conduct its business, maintain its current customers, and recruit new customers. Filing 4 at 22. NavSav's argument is the opposite. It contends that Plaintiffs will be able to go on working, just within the parameters of the restrictive covenants, while NavSav will suffer both financial loss and loss to its goodwill. Filing 7 at 14.

It is true that an employer's loss of income and goodwill because of an employee's breach of post-employment restrictive covenants may be deemed an irreparable harm. The Eighth Circuit has recognized that "irreparable harm can be inferred from a trial court's actual

finding of a breach of a restrictive covenant by the defendant." *Overholt Crop Ins. Serv. Co. v. Travis*, 941 F.2d 1361, 1371 (8th Cir. 1991) (internal quotation marks omitted). Nevertheless, where enforcement of the restrictions in the April Agreement are deemed to exceed the valid interests of NavSav because they offend Nebraska public policy, the possibility of harm to NavSav is of little weight. *Cf. Progressive Techs., Inc. v. Chaffin Holdings, Inc.*, 33 F.4th 481, 486 (8th Cir. 2022) (concluding that restrictive covenants on an employee that unreasonably exceeded the employer's valid interest in protecting customers in violation of Arkansas law and were thus unenforceable, the employer could not show likelihood of success or harm). In contrast to the lack of harm of any significant weight to NavSav, the same Nebraska public policy gives weight to the harm Plaintiffs will suffer if they are subjected to enforcement of the April Agreements. *See Eggers*, 48 F.4th at 564 (requiring the court to consider the balance between the harm to the movant and the injury to opposing party). Here, "the balance of equities tips in [the movant's] favor." *Tumey*, 27 F.4th at 664 (internal quotation marks omitted).

### E.   The Public Interest

The final factor under both *Winter* and *Dataphase* is whether a preliminary injunction is in the public interest. *Winter*, 555 U.S. at 20; *Dataphase*, 640 F.2d at 114. The public has an interest in enforcing contractual obligations. *Sleep No. Corp.*, 33 F.4th at 1019. On the other hand, the public interest must be considered substantially greater in following a fundamental policy of Nebraska not to enforce or reform unreasonable restrictive covenants. *See Waadah*, 861 N.W.2d at 441; *CAE Vanguard, Inc.*, 518 N.W.2d at 655–656. Thus, the public interest also weighs decidedly in favor of the requested preliminary injunction.

Indeed, all factors weigh in favor of the requested preliminary injunction, so the Court will issue it.

**F.  Remaining Matters**

Because the Court concludes that a preliminary injunction should issue, the remaining questions are the scope of the preliminary injunction and the appropriate bond for its issuance. As to whom the Court can enjoin, the Court has the authority to grant a preliminary injunction not just against principal actors but also against officers, agents, servants, employees, and attorneys, as well as those persons or entities in active concert or participation with such persons. *See* Fed. R. Civ. P. 65(d)(2); *see also Carson v. Simon*, 978 F.3d 1051, 1062 (8th Cir. 2020). As to what can be enjoined, the Supreme Court has explained that the scope of a preliminary injunction is "often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (per curiam). "Part of our consideration is whether the injunctive relief is 'no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.'" *Nebraska v. Biden*, 52 F.4th 1044, 1048 (8th Cir. 2022) (quoting *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994)). Another concern is that the injunctive relief must be "workable." *Id.* (citing *North Carolina v. Covington*, 137 S. Ct. 1624, 1625 (2017) (per curiam)). The Court concludes that the substantive terms of the existing Temporary Restraining Order to be consistent with these requirements.

Nevertheless, NavSav argues that if the Court is inclined to grant the preliminary injunction requested, it should limit the injunction to Nebraska-based conduct. Filing 7 at 26. NavSav points out that Beber and Roach admit to selling policies outside of this state, including in Iowa. Filing 7 at 26. NavSav argues that, at the very least, the Court should warn Plaintiffs to proceed with caution as to continued solicitation of customers with whom they worked. Filing 7 at 26. Where for example Beber has already converted customers totaling more than $395,000 to UNICO, NavSav argues that lack of such a warning will "embolden" Beber to solicit even more

customers he serviced while working for NavSav. Filing 7 at 27. NavSav points out that Plaintiffs have not put the non-solicitation portion of the April Agreements at issue for purposes of their Motions for Preliminary Injunctions, and NavSav argues that provision is facially enforceable. Filing 7 at 27.

First, the Court considers a limitation on the geographic scope of a preliminary injunction against enforcement of the restrictive covenants to be contrary to Nebraska public policy that prevents "blue penciling" of restrictive covenants to make them reasonable. *See Waadah*, 861 N.W.2d at 441; *CAE Vanguard, Inc.*, 518 N.W.2d at 655–656. Second, the Court does not agree that the non-solicitation provisions of the April Agreements have not been at issue. Moreover, "cautioning" Plaintiffs not to transgress an agreement that the Court concludes the plaintiffs have a likelihood of showing is unenforceable is simply not appropriate.

Turning to the bond requirement, Rule 65(c) states, "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The Court reads this language to make a bond mandatory before a preliminary injunction can issue. Nevertheless, "[t]he amount of the bond rests within the sound discretion of the trial court and will not be disturbed on appeal in the absence of an abuse of that discretion." *Richland/Wilkin Joint Powers Auth. v. United States Army Corps of Engineers*, 826 F.3d 1030, 1043 (8th Cir. 2016) (quoting *Stockslager v. Carroll Elec. Coop. Corp.*, 528 F.2d 949, 951 (8th Cir. 1976)). The Court concludes that the $1,000 bond or $1,000 cash in lieu of bond imposed for issuance of the Temporary Restraining Order remains sufficient to satisfy the requirements of Federal Rule of Civil Procedure 65(c) for issuance of a Preliminary Injunction.

**III. CONCLUSION**

Upon the foregoing,

IT IS ORDERED that the Motion for Preliminary Injunction in each case is granted.

Separate Preliminary Injunctions will issue in each case.

Dated this 22nd day of August, 2023.

BY THE COURT:

Brian C. Buescher
United States District Judge